**Earl R. ORTMAN, d/b/a Advance Pump & Equipment Co., Plaintiff-Appellee,**

**v.**

**Herbert W. MAASS, d/b/a Herb. Maass Service, Defendant-Appellant.**

**No. 16443.**

United States Court of Appeals Seventh Circuit.

Feb. 16, 1968.

Curtis B. Morsell, Arthur L. Morsell, Jr., Curtis B. Morsell, Jr., Milwaukee, Wis., for appellant.

Jerome E. Randall, Milwaukee, Wis., for appellee.

Before HASTINGS, Chief Judge, and KILEY and CUMMINGS, Circuit Judges.

HASTINGS, Chief Judge.

Defendant-appellant Herbert W. Maass appeals from an adverse judgment entered after trial on plaintiff-appellee Earl R. Ortman's complaint for patent infringement.

Appellee charges that appellant's device infringes three of the four claims of appellee's Patent No. 2,707,030, filed April 24, 1953, and issued April 26, 1955.

Appellant denies infringement and asserts the invalidity of appellee's patent on grounds of anticipation by prior art patents, unpatentable aggregation and obviousness. Appellant also contends appellee acquiesced in the alleged infringement and acted inequitably in bringing this action.

This action concerns adaptors for use in pitless water well installations. An adaptor is a means of connecting the vertical flow pipe, which carries water from the bottom of the well, to the horizontal supply pipe, which carries water from the well to the location where it is to be used, in such a manner that the flow pipe can be disengaged from the supply pipe and lifted out of the well, together with any appurtenances.

Use of an adapter facilitates repair and cleaning of the flow pipe and its appurtenances, such as a submergible pump. After repair or cleaning, the flow pipe can be lowered into the well and re-engaged with the supply pipe. Access to the well is provided by a removable cap on the top of the well casing.

The development of adaptors was impelled by passage of state sanitation laws requiring that fresh water wells be sealed against contamination from surface water and other sources. Before such laws became effective most wells employed pumps located in pits near the tops of the wells. These pits could not be sealed against contamination.

One method of well installation meeting the new statutory requirements utilizes a submergible pump positioned at the bottom of the well within the well casing. The use of a submergible pump makes it necessary to provide a simple means for removing plumbing fixtures and other obstructions from the well casing so that the pump can be raised to ground level through the casing for repair or cleaning. Adaptors permit the removal and replacement of the pump, flow pipe and attachments without excavation and removal of the well casing.

As described in the specification of his patent, appellee's adaptor is designed for use in a well casing of uniform diameter sealed at the top by a removable cap. A flow pipe leads from a submergible pump at the bottom of the well to the top, where it is attached to the cap.

The patented adaptor is described in the three claims in suit:

"1. In a well of the pitless submergible type, a well casing including a plurality of sections, one of the sections having an opening in its wall, a laterally extending housing rigidly secured around the opening to the well casing section in fluid tight engagement therewith, an elbow joint rigidly secured to the housing and having water tight connection therewith and adapted to have a water supply pipe connected therewith, a flow pipe, a T-coupling incorporated in the length of the flow pipe, and a slip joint including a section connected with one arm of the T-coupling and another section connected with the elbow joint, whereby the flow pipe can be connected with the elbow joint and whereby the flow pipe can be disconnected from the elbow joint and shifted laterally away from the housing.

"2. In a well, a well casing, an elbow joint rigidly secured to the well casing and in water tight connection therewith, a supply pipe leading from the well connected to one end of the elbow joint, a flow pipe extending longitudinally of the casing, a T-coupling interposed in the length of the flow pipe, and a slip joint having one sec-

tion connected with the T-coupling and another section carried by the elbow joint whereby the flow pipe and the elbow joint can be interconnected by moving one section of the joint over the other.

"3. In a well, as defined in claim 1, a sealing plug closing the flow pipe above the slip joint section carried by the T-coupling."

According to the specifications, the casing is first installed and the water supply pipe is attached to the elbow joint secured to the adaptor housing. The flow pipe with the pump, T-coupling and upper portion of the slip joint attached is then lowered into the casing.

When the T-coupling is adjacent to the adaptor housing, the flow pipe is shifted sideways to move the upper portion of the slip joint into the housing and then lowered so that the upper portion of the slip joint engages the lower portion. The elbow joint secured to the housing partly supports the pump and flow pipe.

## VALIDITY: ANTICIPATION

Appellant contends appellee's claims were anticipated by Patent No. 2,529,062 (Williams), issued to C. C. Williams on November 7, 1950. The Williams patent was not cited by the Patent Office.

The stated purpose of Williams was to provide a pitless well installation that would be secure from contamination. Although Williams is expressly not limited to the types of pumps described in the patent application, the pumps described are rotary and plunger types located at a distance from the well or located in the well casing above or adjacent to the lateral supply pipe.

Williams is broader in scope than appellee's patent. In pertinent part it discloses an adaptor consisting of a "connector," a "discharge connection" and a gasket. The Williams adaptor is of simpler design than appellee's or appellant's

devices. The connector is a solid fitting with a passage leading from the flow pipe,[1] which screws into the bottom of the connector, to a "port" or orifice on the side of the fitting. At the port the fitting is machined to a flat surface facing down. This surface mates with an upward-facing surface on the discharge connection. The discharge connection is an integral part of the well casing.[2] It is a solid fitting with a passage leading from a port on the machined surface (inside the well casing) to a connection for the supply pipe (outside the well casing).

When the connector, attached to the flow pipe, is lowered into the well and positioned so that its machined surface matches that on the discharge connection, the ports on the connector and the discharge connection match, providing an unobstructed passage from the flow pipe through the connector and discharge connection to the supply pipe. A gasket is provided between the mated machined surfaces.

The connector rests on the inclined surface of the discharge connection, which protrudes into the casing. The connector is wedged between the surface of the discharge connection and the casing wall opposite the discharge connection, providing lateral pressure to hold the surfaces together. The Williams patent shows an optional means of applying downward pressure to hold the surfaces together, using a rod between the connector and the cap on the well casing.

The trial court held Williams did not anticipate claim 1 of appellee's patent. Specifically, it held Williams did not respond to the elements of appellee's claim 1. We agree.

Williams does not disclose the laterally-extended housing contained in appellee's claim 1. Appellee's housing is a box-like structure attached to the side of the casing and opening into the interior of the casing. It permanently houses the lower end of the slip joint, which would extend

---

[1]. If a rotary pump is used, two flow pipes must be used, and the connector is modified accordingly.

[2]. Apparently the discharge connection is field welded into a hole in a section of well casing.

into and obstruct the well shaft if no housing were provided.

In contrast, the discharge connection of Williams, which appellant calls the correspondent of appellee's housing, is a solid fitting welded into the casing wall and having a passage to carry the water through the casing wall. The two housings are wholly dissimilar in structure and function.

Appellant contends that nothing in appellee's claims requires that the slip joint be housed within the laterally-extended housing. This requirement, he contends, was erroneously read into the claims by the trial court. We do not agree.

■ Appellee's claims do not expressly require that the slip joint and the elbow attached to the housing be contained within the housing. However, the claims are to be interpreted in light of the specifications. Oregon Saw Chain Corp. v. McCulloch Motors Corp., 9 Cir., 323 F.2d 758 (1963), cert. denied, 377 U.S. 915, 84 S.Ct. 1180, 12 L.Ed.2d 186 (1964); Minnesota Mining and Mfg. Co. v. Technical Tape Corp., 7 Cir., 309 F.2d 55 (1962), cert. denied, 372 U.S. 942, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963); Scherbatskoy v. United States Steel Corp., 7 Cir., 287 F. 2d 552 (1961).

When interpreted in light of the specifications, appellee's claims implicitly contain the requirement. The specifications describe the process of lowering the flow pipe and pump into the casing. They provide that when the T-coupling on the flow pipe is at the level of the laterally-extended housing, the flow pipe should be shifted sideways to move the upper portion of the slip joint "into" the housing, after which the flow pipe is further lowered so that the two portions of the slip joint engage.

Another element of appellee's claim 1 not found in Williams is the elbow rigidly secured to the housing. In appellee's claim the elbow performs the functions of holding the lower portion of the slip joint, partly supporting the pump and flow pipe when the slip joint is engaged

and changing the water flow from a downward to a lateral direction.

Williams contains no elbow related to the adaptor. In Williams the water flow is changed from an upward to a lateral direction within the connector. An elbow remote from the well casing in Williams, which appellant contends is an anticipation of the elbow in appellee's adaptor, has no function with respect to the adaptor.

The trial court ruled that Williams does not respond to the prefatory language in appellee's claim that the well be of a "submergible type." The court noted that appellant produced no evidence that Williams could be used with a submergible pump and that appellee introduced evidence to the contrary.

Appellant attacks these rulings as error. He cites the language in Williams that its use is not limited to the types of pumps described in the specifications and claims. He contends that Williams anticipated the attachment of a pump or elements of a pump at the lower end of the flow pipe.

We need not consider these contentions nor the contention that appellee's slip joint and Williams' "pressure joint" are equivalents. We have concluded that two elements of appellee's claims, the laterally-extended housing and the elbow attached to the housing, are not found in Williams. Hence, Williams did not anticipate appellee's invention.

## VALIDITY: OBVIOUSNESS

■ Citing Williams and other prior art patents, appellant next contends that appellee's device is unpatentable as an aggregation of old and well-known plumbing fittings and fixtures. This is merely a contention that the combination fails to meet the statutory requirement of non-obviousness contained in 35 U.S.C.A. § 103. American Infra-Red Radiant Co. v. Lambert Industries, Inc., 8 Cir., 360 F.2d 977, 988 (1966), cert. denied 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966); Marston v. J. C. Penney Company, 4 Cir., 353 F.2d 976, 982 (1965), cert. denied,

385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966) ; Otis v. National Tea Company, 7 Cir., 218 F.2d 153, 157 (1955).

■ Combinations of prior art obvious to one skilled in the art are not patentable. Toro Manufacturing Corp. v. Jacobsen Manufacturing Co., 7 Cir., 357 F.2d 901 (1966) ; Akron Brass Company v. Elkhart Brass Manufacturing Co., 7 Cir., 353 F.2d 704 (1965) ; Application of Menough, 323 F.2d 1011, 51 CCPA 741 (1963).

■ However, it is well established "that a combination of old elements in a manner that is unobvious to one skilled in the trade and which produces a new and useful result may be patented." Welsh Co. v. Chernivsky, 7 Cir., 342 F.2d 586, 590 (1965), cert. denied, 382 U.S. 842, 86 S.Ct. 68, 15 L.Ed.2d 83 (1965). See also, Minneapolis-Honeywell Regulator Company v. Midwestern Instruments, Inc., 7 Cir., 298 F.2d 36 (1961) ; Helms Products v. Lake Shore Manufacturing Co., 7 Cir., 227 F.2d 677 (1955).

In Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court outlined the process by which non-obviousness is to be determined:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." Id. at 17, 86 S.Ct. at 694.

The prior art cited by appellant, in addition to the Williams patent, consists of six patents covering slip joints, elbows and other pipe fittings. Appellant produced no evidence that adaptors similar to appellee's were in use prior to the date of appellee's patent.

After examining the prior art patents and considering the evidence, the trial court concluded appellant had failed to prove that the differences between the invention claimed in appellee's claim 1 and the prior art would have been obvious to one having ordinary skill in the art at the time of appellee's invention.

■ Appellant, as the party challenging the validity of the patent in suit, had the burden of establishing its validity. 35 U.S.C.A. § 282.

■ The statutory presumption of validity is only overcome by clear and cogent evidence of invalidity. King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 7 Cir., 357 F.2d 875 (1966), cert. denied, 385 U.S. 817, 87 S.Ct. 38, 17 L. Ed.2d 56 (1966) ; Devex Corporation v. General Motors Corporation, 7 Cir., 321 F.2d 234 (1963), cert. denied, 375 U.S. 971, 84 S.Ct. 490, 11 L.Ed.2d 418 (1964) ; Copease Manufacturing Co. v. American Photocopy Equipment Co., 7 Cir., 298 F. 2d 772 (1961).

The most pertinent prior art patents are Williams, which was not cited by the Patent Office, and Bailey Patent No. 2,-350,863, which was cited.

We have discussed Williams at length in considering the defense of anticipation. Even were we to concede appellant's argument that Williams suggests the attachment of a submergible pump to the bottom of the flow pipe, we do not find it suggests the addition of an externally-extended housing to enclose the permanently-affixed portions of the adaptor, leaving the casing shaft unobstructed. Williams teaches the opposite—that the discharge connection should protrude inside the casing to provide a seat for the connector, and that the connector when in place should fit tightly between the discharge connection and the opposite wall of the casing.

The Bailey patent discloses a backstop nipple for use on an oil well derrick to catch tools that might fall through a pipe. The nipple consists of a short length of pipe with a laterally-extended housing opening into the pipe. The backstop, a two-pronged casting mounted on a pivot in the housing, effectively blocks the pipe to tools or similar objects when it is extended into the pipe. When not extended,

the backstop and the hardware that operates it are located entirely within the housing, and the pipe is unobstructed.

Bailey suggests the use of a laterally-extended housing to house hardware inside a plumbing fixture but outside the main passage. It suggests little else that finds application in appellee's invention.

After examining the prior art, comparing it with the claims in suit and reviewing the meager evidence concerning the level of ordinary skill in the well-drilling art, we are unable to conclude that appellee's invention would have been obvious to one having ordinary skill in the art.

To achieve the combination disclosed by appellee would have required the artisan to discard the principal elements in Williams (the connector and the discharge connection), to discard every element of Bailey except the housing, to conceive of using an elbow protruding through the housing and rigidly attached to it and to conceive the linkage of T-coupling, elbows and slip joint for conveying the water from the flow pipe to the supply pipe. Appellant has failed to discharge his burden of proving the invalidity of claim 1.

Claim 3 adopts the definition of claim 1 and adds as a limitation a sealing plug closing the flow pipe above the T-coupling. The trial court ruled that claim 3 is dependent upon claim 1 and is subject to the same conclusion of validity. We agree.

The trial court held claim 2 invalid on the ground that it failed to distinctly point out and claim the invention as required by 35 U.S.C.A. § 112. The court ruled that the laterally-extended housing is an essential element of the invention and is not contained in claim 2. We agree.

### INFRINGEMENT

The alleged infringing device is described in Maass Patent No. 2,841,223, filed March 25, 1957, and issued July 1, 1958. It is an adaptor for a pitless well installation. Its purpose and that of appellee's device are the same. Its structure is largely identical with that of appellee's device. We need not describe it in detail, but only identify the aspects in which it differs from the claims in suit.

The test of infringement is whether the device claimed in the patent and the alleged infringing device perform substantially the same function in substantially the same way and accomplish substantially the same result. Graver Tank Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Elgen Manufacturing Corporation v. Ventfabrics, Inc., 7 Cir., 314 F.2d 440 (1963); Universal Match Corp. v. New Castle Products, Inc., 7 Cir., 308 F.2d 842 (1962).

There is no question that the alleged infringing device and the device described in appellee's claims 1 and 3 perform the same function and achieve the same result. Their dissimilarity resides in structural differences.

They differ in the location of the coupling on the flow pipe. In appellee's claims the coupling is "incorporated in the length of the flow pipe." In his drawings the flow pipe extends upward to the cap on the well casing and is attached to the cap. On appellant's device the flow pipe does not extend above the coupling.

This difference is not significant. Appellee's claims do not contain the limitation that the flow pipe be attached to the cap, and we do not find it an essential element of the invention. The upper extension of the pipe has no significant effect on the flow of water through the flow pipe and adaptor. This is illustrated by the limitation in claim 3 that the flow pipe be plugged above the T-coupling. The only function of the upper extension is to enable a workman to take hold of the flow pipe and pull it from the well. That is also the function of appellant's removable "drop pipe," which screws into a socket on the top of appellant's coupling. The two are equivalents.

The two devices differ in the shape of the laterally-extended housing. The sides of the housing shown in appellee's draw-

ings are rectangular, while the sides of appellant's housing are triangular.

Appellee's claims contain no limitation on the shape of the housing, and the shape of the housing has no apparent significance. This dissimilarity is no defense to the charge of infringement.

The devices differ in the type of the coupling used. Appellee's coupling is T-shaped, its lateral extension forming an angle of ninety degrees with the flow pipe. Appellant's coupling is Y-shaped, its lateral extension forming an acute angle with the flow pipe.

The angulation of the coupling is insignificant. Both couplings have the function of diverting the water from its upward direction in the flow pipe and directing it toward the slip joint. The difference between the angles is manifestly one of degree only.

The devices differ in the nature of the upper portion of the slip joint. Appellee's claim describes a "section [of the slip joint] connected with one arm of the T-coupling." His drawings show a conventional appearing female portion of a slip joint screwed into a conventional appearing elbow that is in turn screwed into the T-coupling.

The upper mating or joining element on appellant's device is an integral portion of the Y-coupling. Appellant's coupling is a bronze casting. It has a threaded socket at the top to receive the drop pipe and an internally threaded opening at the bottom to receive the flow pipe. As noted, its lateral extension is directed down. The interior of the opening at the lower end of the extension is smoothly machined to slip over and mate with a "nipple" attached to the triangular housing.

Appellant's specially designed and cast coupling is more sophisticated than the linkage of conventional plumbing fixtures used in appellee's device, but the two are substantially identical in function, means and result. Appellant has merely melded together the essential features of a T-coupling, an elbow and the female portion of a slip joint, eliminating the threading

and sleeves necessary to link conventional fittings together. Appellant's coupling incorporates the diversion feature of the T-coupling, the direction feature of the elbow and the mating feature of the slip joint element. The separability of these elements in appellee's adaptor is not an essential feature of his invention.

Finally, the devices differ in the position of elements in relation to the housing. In appellee's claim the male portion of the slip joint is attached to an elbow welded to the housing. On appellant's device the nipple protrudes through the housing wall and is welded to it. The outside end of the nipple is externally threaded so that an elbow may be screwed onto it.

Appellant contends that the elbow is optional on his adaptor and notes that it is readily removable from the adaptor. He argues that in actual practice the water supply pipe could be connected directly to the nipple, or that flexible or plastic tubing could be used.

The answer is that if the water supply pipe is not to be directed away from the surface, but is to lead to a location where the water can be used, there must be some means of directing the water from its downward direction in the nipple to a more useful direction. Whatever that means is, and whatever its composition, it is the equivalent of an "elbow." An elbow is as necessarily a part of appellant's device as it is a part of appellee's device.

However they are connected, the elbow and nipple (male portion of the slip joint) on both appellant's and appellee's devices are joined together when the adaptor is properly installed. They may be considered as units for purposes of comparison.

Both elbow-nipple units are machined at their upper extremities to slip into and mate with a female mating element attached to a flow pipe. Both have curved passages to direct water flow from a downward to a lateral direction. Both have sleeves to receive a water supply pipe. Finally, both are welded to a hous-

ing wall. The only differences are in the angulation of the nipple and in the position of the junction (of elbow and nipple) in relation to the housing wall. These differences are insignificant. The elbow and nipple perform substantially the same function in both devices.

■ Considering all elements of the patent claims in suit and of the alleged infringing device, we conclude that they are equivalents and that appellant's device infringes the claims in suit.

### EQUITABLE DEFENSES

■ At a late point in the proceedings below, appellant raised equitable defenses. The trial court rejected these defenses on the grounds that they were raised too late and that the evidence presented failed to establish them. We find no errors in these rulings.

Finding no error, the judgment of the district court is affirmed.

Affirmed.